121-1137 W.C. The Final Call, Inc. Appellant by Berv Power v. Illinois Workers' Compensation Comm'n, Illinois State Treasurer and Kenneth Wright, Appellees by Mary Labreck and Hugo Ortiz. Mr. Power, you may proceed. Thank you. May it please the Court, Bervy Power on behalf of The Final Call, who is the appellant, thank the Justices for allowing us this oral argument time. I would like to start with the questions of law before getting to the questions of fact. The first question of law that I would like to raise with the Court is that we maintain, as we did in the brief, that The Final Call is not an employer as contemplated by the Act as noted in the claimant's testimony during the hearing, that he recognized it as a religious institution, but the individuals and the parishioners of the Nation of Islam, a tenet of the faith is to give of their time and of their services in what's called charity, and when available, receive charity, not in exchange for work, but as a result of the tenet of the faith is called zakat in Islam. So to that extent, The Final Call we maintain was not an employer as contemplated by the Act. Additionally, as another point, as we know, the Workers' Compensation Act was designed to protect workers who worked in, quite honestly, inherently dangerous conditions of employment, and while the Commission has identified the one provision of the Act that or is powered in some other way as contemplating a hazardous environment, we would maintain that there are no cases that we could find that identified computers, the existence of a computer or a copier as being extra hazardous. So we would maintain that the spirit of the Act, that in particularly cases that we cannot find, would not automatically subject The Final Call to the Act itself, because we would maintain that simply the existence of a computer or a copier would not justify the designation of being extra hazardous, along with bulldozers, blow torches, and sharp objects. So with that respect, that's two arguments that we'd like to make, but there's something we would offer as well in the way of personal jurisdiction, and that is we maintained in our brief that notice was not provided within 45 days pursuant to the statute, and this is a point that I would definitely not try and split hairs with the Court, but just make it very clear that the Commission, when it adopted the arbitrator's determination, actually made a misstatement of fact, and in the record on page C-74, the Commission stated the day following the accident, Petitioner reported to the editor, Petitioner reported the accident himself to the there's no place in the record that says on January 8th, 2009, the Petitioner did that, and in fact on the 7th, Mr. Wright testified that he asked the nurse and or his girlfriend to contact the editor, but no testimony that any of that was ever done, and in fact about it, in the transcript you'll see where it said to let the editor know he was in the hospital, the Court is very well aware that giving the notice of a location is not meeting the act, someone would have to notify the quote-unquote employer to say that the incident happened in the course of some employment, once again for argument's sake, though we're not conceding that Final Call is an employer, but for argument's sake, the first notification to the nurse was to say to the editor, according to his testimony, that he was in the hospital, and the specific testimony that was given by the claimant himself on page or record located at 133, the question was asked, do you know who reported it on your behalf? I requested the nurse contact at that time, my girlfriend and the editor at the Final Call to let them know I was in the hospital, question, and following that day, did you have an opportunity to report the accident yourself to anyone? Yes I did, to whom? To the editor. Following that day is a big difference from the following day, there's only one designation for the following day, that would be January 8th, following that day is every day of the rest of the year, and what is found in the record is the claimant was specifically asked the question regarding the letter that he received that makes mention of March of 2009, is that when you contacted the editor to apprise the editor of the injury and he said yes, March is beyond 52 days beyond January 7th, so this is a point that the circuit court glossed over respectfully, I'm saying it respectfully, the circuit court glossed over it and did not address it at all and went to prejudice, though of course as argued in our brief, we can't even get to prejudice if you don't get to sufficient notice, and in this case we would argue that there's no testimony anywhere in the record that the following day the claimant gave any sufficient notice to the editor, but the provided that notice, so that's the question of law we would offer, as well as the question of fact, and with respect to fact we would argue that the weight of the evidence leans completely against the determination, the manifest weight of the evidence leans completely against the determination that it was the very next day that he gave, if I can interject a for the court to resolve in the course of deciding the case, but aside from the issues that you have raised, as you know the commission ultimately determined that an employee-employer relationship existed between the final call and the claimant, what is your response to that finding that they made based on the evidence? Thank you so much, the case law indicates that the most important factor, that's in the case of Ware, the single most important factor to consider in determining whether a person is an employee is whether the purported employer has a right to control the person's actions. The claimant found that record 230, C-230, stated out of his mouth I was never given any restrictions by the final call on what I could cover and not cover do or not do. He was not assigned by the final call to go to certain locations and cover certain stories, they had no input on that? Well no, there was input judge, but we also also identified that Chicago Defender did the very same thing, that he would be called as a photographer, it's in the record, and he would be for lack of a better word dispatched to take some photographs, so I would offer that his testimony that he was not an employee of the Chicago Defender, but yet the Chicago Defender called him to go take, assigned him if you will, to go take photographs, the final call did the exact same thing. Did he go to the Chicago Defender offices four days out of five? I'm sorry, could you repeat that please? Did he go to the offices of the Defender four days out of five? That's not in the record. He did go to your to the offices of final call four days out of five, according to his testimony. It was in the record, but what he was doing at the final call, the question is the control. He did not indicate he used the computers at the final call to do his work. That was the testimony that he provided, so he did not say that he had a computer at home, but he was directed to come to the final call, so I would offer that the fact that he went to the final call, that he used computers and do his work, was opportune to him being a photographer, but not an employee of the final call. What does whether he used the computer have to do whether he was an employee? I'm saying the fact that you asked about going to the final call, and I said that he would go to the final call to use the computer and copier as a photographer, not as an employee, that's what I'm saying. Didn't he testify that he had to tell the editor or the manager at the final call if he wasn't coming in, and he had a call in every day, and they had to approve any of the assignments that he went on. Didn't he testify to all that? Well, some of that, yes, but not all of it, because when he indicated that on the date in question, he was not assigned to go to that, no one asked him to go, he went on his own volition, so I'm just offering that to say that, yes, he did say some of that in his testimony, but also in the testimony was the date in question, he was not assigned to do it, and what was also in the record is that he shopped these photographs around, and so on the date in question, if the final call didn't use it, he said he was going to try and sell it to the Defender or the Crusader, and so to that extent, how can he be working for the final call, but at the same time say, I'm also going to use or send this information to the Defender and the Crusader, so that's what I would say on that. I believe one of the other, I wanted to ask you, obviously, you're suggesting that the claimant here is some sort of an independent contractor, not an employee of the final call, but my question was, who owned the cameras and who provided the equipment that the claimant used? So, as you, as I'm sure you saw in the record, the claimant had his own photographs of own cameras when he started taking photographs for the final call. When the digital age came in, from the film to the digital, the final call helped him, if you will, have a camera that would be up to date than the film, so to that extent, both exist in this situation. He had his own until the cameras changed over to digital, and then he was given that as a way to help him in taking his photographs, and you also remember in the record that he used that camera to take pictures for the Crusader and the Defender, so the final call did not authorize him to use their equipment for other competitors in their complainant in what he was doing, but not to justify him as an employee. Now, did he receive regular bi-weekly checks from the final call? He did, he did, and I believe we argued that the checks themselves were not necessarily paid to be some evidence of bi-weekly payment as opposed to accounting for the charity, wherein it allowed for a more structured, if you will, way of distributing charity to individuals, but not per se a paycheck, as would be customary in a non-religious setting as the final call, so it was more accounting than it was some regular cycle for payments, but there's a couple other points that I think are very critical to this argument, and one is that the determination of benefits, the record is very clear that there was a significant delay in Mr. Wright after surgery going to accelerated rehab. The surgery occurred in March, March 26th of 2009. He had a few post-op visits with the surgeon, and then from June 30th, when he was able, when his knee brace was unlocked completely, and he was able to do a straight leg raise, he did not see any other rehabilitation services at all until April of 2010, March of 2010, so literally nearly a year later, and why is that important? Because he's claiming all of that time, it was awarded, in fact, by the commission benefits during that time, and the court is very well aware that once a claimant reaches MMI, TTD ceases, and so in this case, after he went to rehab, he was able to bend his knee and do a straight leg raise. Well, why is that significant? Because he did that nearly a year before that time, so if a straight leg raise and a bended knee is the equivalent of MMI, then he did that on June 30th of 2009, so there was absolutely no difference in the MMI designated after rehab than it was on June 30th, 2009, when he was making those misrepresentations to the surgeon that he was, in fact, in rehab, so I would offer that the because after June of 2009, he had reached MMI already. A couple of last points on arising out of and in the course of. The Caterpillar case is very clear, it's still good law that when the court indicated that it is not prepared to adopt a position that whenever an injury is suffered on work premises during work hours that it is compensable. Why is that important? Because the three categories of risk, as the court is well aware, is the risk distinctly associated with the employment, risk that is personal to the employee, and neutral risks, and in this case, this is not hazardous, extra hazardous, taking photographs, unlike operating heavy machinery. Mr. Power, the red light has come on. Oh, I can't. You will have time in reply, OK? OK, thank you so much. Sorry about that. No, no, no problem. I believe you're splitting the time, Mr. Ortiz and Ms. Labreck, is that correct? It is correct. Again, who's proceeding first? I will. OK, Mr. Ortiz, you may respond. Good morning, your honors, and may it please the court. I'm Hugo Ortiz, I represent the appellee Kenneth Wright, and we ask this court to affirm the circuit court's decision and the commission's decision. There is no proof that the circuit court made any errors in any of its findings, nothing that would be considered against the manifest weight of the evidence. To the contrary, the record makes clear that Mr. Wright proved all of the elements necessary to receive benefits under the Illinois Workers' Compensation Act. The record is devoid of any facts, evidence, or anything whatsoever that shows the lower court's decision was against the manifest weight of the evidence. Mr. Ortiz, you realize we review the commission's decision, not the circuit court's? Yes, your honor, yes, I meant the commission. But to now move on to response to Mr. Power's argument, I'll turn first to the issue of the employment relationship, which you brought up first. The record shows that the final call controlled Mr. Wright's office. He was required to seek approval from the final call as to what stories he can pursue. He had a right and the ability to choose what kind of stories he would like to pursue, but they would have to be approved by the final call before he could proceed. As the record shows, the final call provided the equipment. When the final call fired Mr. Wright, they did go to his residence and they picked up the cameras and the memory cards with all of the photographs that he had taken. I think a glaring thing that Mr. Power did not address in his argument was the existence of two pieces of very crucial evidence. First, the letter from his own law firm confirming that Mr. Wright was indeed an employee of the final call. That letter shows that he was employed and it basically gave him notice that he was being fired from his employment. Secondly, there are several newspapers that were entered into evidence in which they specifically show Kenneth Wright by his previous name, Kenneth Muhammad, as the staff photographer for the final call. So there was really nothing that would leave any reasonable conclusion that the findings were against the manifest weight of the evidence. As to the second issue that Mr. Power raised, which is a notice issue, there's unrebutted testimony that Mr. Wright provided notice on the day of the accident. His girlfriend called the editor or the supervisor and provided notice that he had been injured on his way to cover a story. And then the following day, Mr. Wright's unrebutted testimony showed that he also provided notice himself. At that point, if there was any defect of notice, then the final call would have had to provide some sort of proof of prejudice, which it didn't. At trial, as the commission noted, there was absolutely no evidence of any prejudice. So as a result of that, there is nothing against the manifest weight of the evidence as to the notice that he provided. The next issue after that is the employment relationship. I'm sorry, the final call is not an employer. Sorry, that was the first one. The evidence shows that the plain language of the act provides automatic coverage for any employer that uses copy machines, electronic equipment. There's nothing in the act to to exempt any religious organizations from being an employer. And here it is quite clear that the and staff members are employees per the act. And as to the benefits that Mr. Power brought up, Mr. Wright deserves to be paid all his outstanding benefits. His medical records consistently show that he was temporarily totally disabled. They show that after his surgery, his physician gave him work restrictions, which the final call did not accommodate. Mr. Wright was forced to fend for himself without receiving any benefits. And the final call does argue that the ability to do a straight leg test, a straight leg raise and bend his knee equates to being able to work. But that simply is not true pursuant to the act. The law says that an employee need not be totally disabled to receive benefits. Yet the final call complates Wright's mobility of his left leg and his knee as being MMI, which is not true. Only a medical professional can determine maximum medical improvement. The final call does not have such a medical opinion. The final call did not obtain an independent medical evaluation. And as such, all of the final calls arguments with respect to the medicine are conclusory and devoid of any medical opinion that the court can rely on. Mr. Wright is also entitled to the permanent partial disability benefits under the act. The commission awarded 25% loss of use of the left leg and 2% of the person as a whole for his injuries. They show the medical treatment, the surgery that he had to undergo and the physical therapy. As far as the timing of all this treatment, it's very difficult for any person who is not receiving any income and who is injured to obtain immediate medical care when the employer has basically left this person to fend for himself. Mr. Wright's testimony and medical records show that the injuries that he sustained in a previous accident did not result in any limited mobility, any permanent conditions that would affect his ability to work. There was no major medical treatment or any incapacity. Again, the final call failed to get an independent medical evaluation that would have rebutted his records. And as such, the final call does again rely on its own conclusory statements, but there's no medical evidence to refute Wright's medical history or his testimony. And for these reasons, your honors, we ask that this honorable court affirm the commission's decision. Thank you. Okay. Thank you, counsel. Ms. Lebrecht, you may respond. Good morning, your honors. Counsel, may it please the court. My name is Mary Lebrecht. I am an assistant attorney general here representing the defendant appellee, Illinois state treasurer as ex officio custodian of the injured workers benefit fund. As you know, we don't favor either party in this dispute. Our role is to make sure that money is properly paid out from the fund, that it's paid where due and not paid out where it isn't due. But we believe that Wright has presented credible evidence of each element of his claim. And the final call has presented none, even where the evidence was entirely within their control, such as testimony from management about whether they received notice. Instead, they bring three kinds of arguments, strained interpretation of Wright's own words and language and other documents. They invite suspicion of his motivations and his honesty without evidence to support it. And they offer their own interpretations of the medical evidence. But it's not enough for them to suggest an alternative explanation of the medical evidence that seems plausible to a lay person. Now addressing the particular issues on the extra hazardous issue, we agree with Mr. Power that there's not a lot of case law on this. However, the statute does define employer as including religious bodies, and it's only purely gratuitous workers that are excluded from the act. On the issue of notice, there are there are two points. Mr. Wright said he reported it to the editor. And the commission found that his testimony was credible and unrebutted. And the commission acted reasonably in doing the statement that he followed up as meaning within a day or so. A few days difference isn't crucial, but it's clear that the nature of his statements to the editor suggests that he made them early on, because he told the editor that he couldn't walk because the editor didn't know that yet. And he said he needed to get x rays, which is something that he thought at the very beginning of this issue. Also, I'd like to point out that the final call knew three things. It knew he was going out to cover a story for them. It knew he had an accident somewhere in that time period. And it knew that he didn't come back with any photos. So even if he did refer to the accident in an ambiguous way, a reasonable person would have been alerted to the possibility that it was within the scope of his employment. And finally, there's no evidence that anyone ever claimed that final call lack notice until they were for the arbitrator. The September 2009 letter in which they discharged him, they were clearly trying to forestall a workers compensation claim. And they said nothing about notice or his employment status. They claimed only that he was not within the scope of his employment. As to whether he was an employer independent contractor, I won't be there are a number of reasons to think that he controlled that the final call controlled Mr. Wright's work. And the final call relies on this statement that he was never given any restrictions on what he could cover and not cover. But that statement was addressed to a particular question about whether he was able to make personal use of the camera. And he suggested that that other other companies gave him a particular job, but giving him a particular job is not the same thing as keeping him on staff. And he did exercise discretion here, but he was assigned to exercise discretion and finding photos and taking them. And some employees are assigned to have jobs that include discretion. And he did sell photographs to other newspapers, but that does show that he was an independent contractor, because he sold photographs only that the final call didn't want. In this context, letting him sell the rejected photos is similar to allowing caterers and their assistants to take home leftover food, something that's not needed, and it's a benefit they can give them. So they do. As your honor, notice he received a biweekly paycheck, which was essentially a salary. It was not broken down by the hour and it was labeled charity, to be sure, but ordinarily independent contractors are paid by job or by photo and not by biweekly salary payments. And as far as the idea that this was charity, that won't work because the September 2009 letter explicitly linked the loss of his charity with the fact that he was not actively working. And also he received the charity when he was able to work, and he was deprived of when he couldn't work and needed it most. And that's not usually the way that charity works. Finally, the right to discharge him was exercised by the final call when it sent the September 2009 letter. It not only says he was once employed, but it makes a point of saying that he was not injured during the course and scope of his employment. And it would not be necessary to say this if they thought he was an independent contractor. And the labels used by the party co-counsel suggested some of the ways that they took steps to vest him with a change of status. Wright also told medical personnel that he was an employee, and the surgeon wrote several times to the final call to apprise him of his progress and his expectations, addressing him as the employer and one who has a right to reports as a payer of benefits. And they apparently didn't object to that. As to the issue of maximum medical improvement, the straight leg raise is not equivalent to a physical therapy. And there are several reasons why the May to June 2009 period in which he was able to raise his leg should not qualify as maximum medical improvement, because they suggested there was more to do. They said they unlocked the brace, but not that they removed it. They said he should continue physical therapy and follow up again with them in six weeks. On the other hand, the commission found that April 10th was the correct date for maximum medical improvement. And this was consistent both with the surgeon's prediction at the time when he did the surgery that he would have a recovery period of 12 to 18 months. He might be able to go back to work. As we know, that didn't happen. They didn't work out a way that he'd go back to work before he was fully recovered. But he was well within that 12 to 18 month period. He was at the lower end of it. And then we also have the rehabilitation center that found that he reached maximum rehabilitation benefits in April 2010. In light of both those things, the commission's determination that he reached maximum medical improvement at that time was not against the evidence. And there was no evidence of malingering. With respect to the remaining issues, we stand on our brief. We urge this court to affirm the circuit court's judgment, thereby upholding the commission's award of benefits. Thank you, counsel. Mr. Power, you may reply. Justice Holdren, I can see the lights now. First, I would just like to say that the final call allows for religious faiths to define themselves, so long as it does not cause harm or injury to anyone else. And in this case, the parishioners that the final call members include are duty-bound, if you will, to work to propagate the faith. And the final call newspaper is the organ by which that happens. So to that extent, it is still we maintain an exercise of the faith and not a condition of employment that the final call is put out. In addition, that I would just like to say, you know, the reference to this letter from my law firm has been made a couple of times, but there's one part that's not mentioned with respect to the testimony. And that is when I asked Mr. Wright the question, when it talks about in March of 2009, is that it says that you informed the final call that you were unable to work because you injured yourself while traveling on public transportation. Is that a memorialization of when you notified them of your quote-unquote work injury? Yes. They cannot get around. He said that it was at that time, not the day after. So I would just ask that the court look, take that into consideration when making that assessment. In addition, with respect to charity, you know, the arguments have been made that, well, charity was paid because of work, but it was not. From the time that he was not taking any photographs for months, he was still provided charity is noted in that letter. It was not an exchange for work. It was because he was observed as a parishioner of the faith. And therefore the final call was duty bound to help support. And so it can't be argued both ways that these were payments for work, but yet he was being given charity, not in exchange for photographs, but because he was a member of the faith. And so I would just offer that these points still point to the fact that there's some matters of law, as well as some matters of fact. And we would argue that the manifesto of the evidence when looking at its totality would indicate the arguments that we have raised in our brief, as well as in this argument that does not comport with what the commission has held. Mr. Parr, could I ask a question? When did the charity payments to the claimant stop and why? Sure. Well, okay. It was a September, if I recall correctly, September of 2009. And the nature of charity is that it's provided from the charitable donations of parishioners. And in the faith, it indicates that those who helped to propagate the faith can receive charity in return. And so it wasn't a matter of work, but obviously it can only go on so long because it is the source of, it is from charity of members and parishioners. And so to that extent, it became more of an And that was just the determination that was made. So you had indicated, and correct me if I misinterpret this, you had indicated that with regard to the parishioners obligation to the faith was to propagate the faith, and that was their contribution. And that the faith was duty bound to support its members who were out spreading the word, if you will. That is correct. And it's literally the propagation of the faith that is the focal point here, not just work, if you will. So just so that I'm clear, and I apologize for my ignorance on this subject, but the propagation of the faith by the parishioners, is that something that results in some type of monetary benefit to the faith? Or is it simply someone standing on the corner preaching the word, if you will? Sure. So the Final Call newspaper actually is the organ that is in the written organ, much like the Watchtower for the Jehovah's Witnesses. And donations are provided in exchange for receiving the Final Call newspaper. Those funds do go help to continue the propagation through the Final Call newspaper. So it's a cycle that, yes, the paper itself, once published and produced, donations are received in exchange for it, and then that is designed to help those who help get it out. Okay. And so my final question, I know, just soldiers will probably remind both of us that the red light is on now. But if you'll indulge me for one last question. I'm assuming that not everyone in the faith works at this newspaper. That's correct. There are other jobs that don't, not jobs, I'd be putting words in your mouth if I said other jobs. There are other activities that the parishioners are expected or allowed to do that don't result in direct payment to the faith. Is that correct? It varies. So yes, there's some who may come to a location to be present to aid with an So those the gradations make the difference. But you're right, not every single person can receive something because it doesn't exist monetarily. But those who help in aiding and propagating the faith, we do our best to support. Okay. All right. Thank you for clearing up that for me. Thank you. Thank you, counsel, for your arguments in this matter this morning.